1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 18-cr-118-RM
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
MICHAEL ARTHUR GERBER,
7
     Defendant.
8   _____

9                    **REPORTER'S TRANSCRIPT**
                      SENTENCING HEARING
10  _____

11       Proceedings before the HONORABLE RAYMOND MOORE, Judge,

12  United States District Court for the District of Colorado,

13  occurring at 9 a.m., on the 3rd day of January, 2019, in

14  Courtroom A601, United States Courthouse, Denver, Colorado.

15                       **APPEARANCES**

16       DANIEL BURROWS, Assistant U.S. Attorney, 1225 17th

17  Street, Suite 700, Denver, Colorado, 80202, appearing for the

18  Government.

19       JOHN SULLIVAN, Attorney at Law, John F. Sullivan, III,

20  P.C., 1745 Shea Center Drive, 4th Floor, Highlands Ranch, CO

21  80129, appearing for the Defendant.

22

23       TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
              901 19th Street, Denver, Colorado 80294
24       Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer
25

1       **P R O C E E D I N G S**

2       (In open court at 9:32 a.m.)

3              *THE COURT:*  Please be seated.  All right.  18-cr-118,

4       United States versus Michael Arthur Gerber.  Appearances

5       please.

6              *MR. BURROWS:*  Good morning, Your Honor.

7       Daniel Burrows on behalf of the government.

8              *THE COURT:*  Good morning to you, sir.

9              *MR. SULLIVAN:*  Judge, good morning.  John Sullivan on

10      behalf of Mr. Gerber, who is present, to my left, in custody.

11             *THE COURT:*  Good morning to you.  Good morning to

12      Mr. Gerber, as well.  We're here today for sentencing following

13      an earlier plea of guilty to assaulting a federal employee.

14             At this time I formally accept the Plea Agreement,

15      pursuant to which the plea of guilty was made back in October,

16      I believe it was.

17             Let me ask, Mr. Sullivan, have you received a copy of

18      the presentence report addendum, had sufficient time to review

19      those materials, as well as to discuss them with your client?

20             *MR. SULLIVAN:*  Yes to all, Judge.

21             *THE COURT:*  Same true for you, Mr. Burrows?

22             *MR. BURROWS:*  Yes, Your Honor.

23             *THE COURT:*  Okay.  So what has been filed, in this

24      case, is the following, the government has filed a Motion To

25      Dismiss, which I think relates to Count 2 of the Indictment?

1              MR. BURROWS:  That's correct, Your Honor.

2              THE COURT:  And that motion is granted effective as of

3      the end of this hearing.  Moreover, the government has filed a

4      response to various objections that were filed by the

5      defendant.  The defendant's objections are **ECF Number 63**.  The

6      government's response is **Number 65**, and then relatedly, there

7      is a Motion For Statutory Sentence, which is filed at **ECF**

8      **Number 68**.

9              So have I missed anything for the government?

10             MR. BURROWS:  No, Your Honor.  I just would note,

11     briefly, **Document 68**, due to confusing things on ECF, was filed

12     in way that the government couldn't access it.  Defense counsel

13     did provide me with a copy, insofar as any concern about that,

14     there shouldn't be any concern.

15             THE COURT:  Okay.  In any event, Mr. Sullivan, have I

16     missed anything from your side, from your perspective?

17             MR. SULLIVAN:  No, Your Honor.  Thank you.

18             THE COURT:  Then let's just go to the objections and

19     get them resolved.  I don't -- to some extent I think that the

20     heart of this case lies outside of the objections, but I think

21     the objections are more of a lead in to it.

22             There were a number of objections that were made,

23     related to paragraph 7, 21, 22, 42, 83 and the justification.

24     In terms of the justification, I understand from defendant's

25     perspective, some counsel object, some counsel don't.  My view

1    of it is, there is nothing to object to, in terms of the

2    recommendation of the probation department.  It's not something

3    that I resolve by way of sustaining or overruling an objection.

4    They have made a recommendation, counsel has another or

5    different record that they do, and I understand that, but I'm

6    just telling you that I don't treat it as a classic objection,

7    as to which I have to file some -- not file, but make some kind

8    a ruling, either in favor or against the objection.

9         I note your position.  You disagree with their

10   recommendation and their justification and that's fine, and we

11   will get to that and discuss that in more depth when trying to

12   decide what is the appropriate sentence in this case.

13        With regard to the rest of it, the -- I tend to agree

14   with the addendum, and the addendum essentially says this, much

15   of these -- of the matters that are contained in the

16   objections, provide additional and clarifying information with

17   regard to various matters.

18        There is one set of objections as to which that

19   statement is less than true, and that is where you are

20   objecting to paragraph 21 and 22.

21        So let's just set paragraphs 21 and 22 aside.  Is

22   there anything that you think needs -- that I need to do, given

23   that the probation department has acknowledged that the

24   additional information that you have provided, the context, if

25   you would, is there, and that they characterize it, as I would,

1    as clarifying information as opposed to some statement of

2    factual inaccuracies?  Do you have any difficulty with that?

3           MR. SULLIVAN:  Judge, I don't.  And you have seen all

4    of the recent appellate rulings where, if counsel doesn't

5    object at sentencing, so I'm trying to just be careful.

6           THE COURT:  Look, I'm not criticizing and I am not

7    suggesting that you are doing something inappropriate.  You are

8    raising matters that are being brought to my attention, I

9    recognize it.  I'm just saying, to you, that I have -- I accept

10   it, I consider it, as clarified by you, but beyond that, I

11   don't know that there's anything for me to do, and so beyond

12   that I would deny it as moot, unless there's something else

13   that you want me to focus on?

14          MR. SULLIVAN:  I guess the only thing was in

15   paragraphs 20 and 21 --

16          THE COURT:  Well, 20 and 21 we have not gotten to,

17   yet.  I'm talking about exclusive of 20 and 21.

18          MR. SULLIVAN:  Then the answer is no.

19          THE COURT:  Okay.  Paragraph 20 and 21 pertain to

20   Count 2, which is the count that is being dismissed.  I

21   understand that you are saying that he has pleaded not guilty

22   to that count, but I also understand that I am not restricted

23   from considering any fact, in terms of deciding what is the

24   appropriate sentence.  I think that's the position that the

25   government essentially took, which is, these are matters which

1    are -- which can be considered, not for guideline purposes, but

2    can be considered -- I shouldn't even say not for guideline

3    purposes.  There are circumstances where dismissed counts are

4    relevant to guideline purposes, to the extent that they

5    constitute relevant conduct.  This does not, and I am not

6    suggesting that it does, and no one has factored any of this

7    in, but in terms of the overall sentencing inquiry, that I must

8    make, there are facts here which are appropriate for my

9    consideration, and if I'm going to be more blunt about it than

10   that, I will be.

11          Here's what I'm really saying, when we begin our

12   discussion, everybody in this room knows what we're going to be

13   talking about, and that is, how much of this is mental health

14   and how much of this is just something else, aggressive, ornery

15   guy.

16          I hope that one of you has a wonderful invention that

17   enables me to assign the correct percentage, and I know that

18   neither of you do.  But this is, again, all part and parcel of

19   the same kind of conduct.  We have what went on in this case,

20   we have what went on with respect to Count 2, we have what went

21   on with respect to the petty offense, we have what went on with

22   respect to the state telephone harassment.  All of it is a

23   series of conduct, all in the same timeframe, all tethered to

24   the same questions, which is, "What are we looking at here?"

25   And all of it legitimate points of concern that I think I

1    should and will consider.  So I understand the objection.  I

2    overrule the objection, and I give you an opportunity to make

3    whatever further record you want to make.

4            MR. SULLIVAN:  You know, Judge, a lot of that was --

5    it's not relevant conduct.  We both agree on that.

6            THE COURT:  Right.  I do, as well.

7            MR. SULLIVAN:  And we even took it out of the Plea

8    Agreement to take it out of making it relevant conduct.  I

9    ended up going on appeal on acquitted conduct, so I wanted to

10   make sure somehow if we ended up on appeal, God forbid, it

11   wouldn't be considered acquitted conduct, and so I just felt

12   that it was important that whatever any other -- we may never

13   end up there, but looked at it as at least counsel was aware

14   enough that it could be considered this, it could be considered

15   that.  I'm not restricting anything.  You can consider anything

16   you want.

17           THE COURT:  Right.  And I understand, and again, I'm

18   not quarreling with your choice to protection of flanks, so to

19   speak.

20           MR. SULLIVAN:  That's all.

21           THE COURT:  I'm just saying that I understand your

22   position, I understand that I should not, and I am not treating

23   him as, quote/unquote, guilty of it in some way.  It was

24   conduct that was charged.  It was conduct that is the subject

25   of a dismissal.

1          MR. SULLIVAN:  I'm fine with that, Judge.

2          THE COURT:  But it's also wholly consistent with

3    everything else that was going on around that period and to

4    pretend that it's not there, I think, melon balls a relevant

5    fact out of my consideration as to what to do at sentencing.

6          MR. SULLIVAN:  Sure, fine.

7          THE COURT:  All right.  So that, I think, resolves all

8    of the objections.  I didn't hear from you, Mr. Burrows, but I

9    suppose I can't imagine you have got anything you want to say

10   with regard to any of that?

11         MR. BURROWS:  No, Your Honor.

12         THE COURT:  Then let's talk about, "What is the

13   appropriate sentence?"  And I understand what the result of

14   what I have just have done is.  Let me just make clear the

15   guideline findings that I need to make.  There is no -- well,

16   there are no objections to the factual matters contained in the

17   presentence report.  There are some objections as to

18   clarifying, but those have been resolved.  And I have also

19   discussed my view of paragraph 21 and 22, that aside, and no

20   other objections, and all of the other matters are matters that

21   I take as factual findings.  In terms of the guidelines,

22   there's no objections, whatsoever, and so the guideline

23   computations in the report are my guideline findings for

24   purposes of sentencing.

25         Total Offense Level is 13, the defendant's Criminal

1    History Category is II, which results in an imprisonment range

2    of 15 to 21 months, a fine range of 5500 to 55,000, and

3    supervised-release range of one to three years.

4           I suppose for sake of completeness, I ought to cover

5    something that I believe -- if I get it wrong, Mr. Burrows,

6    please, you know this, and you are not shy about it, correct

7    me.  There was a provision in the Plea Agreement that basically

8    said that the parties weren't going to object to an additional

9    one point.  Frankly, the presentence report notes that, and

10   says, in essence, that the government is not going to be

11   pursuing that.  Frankly, whether -- whether you pursued it or

12   not, it really wouldn't make one whit of difference.  You would

13   go from two points to three points and remain in Criminal

14   History Category II, but I don't want to be blind to that.

15          MR. BURROWS:  I -- that's accurate, Your Honor.  It's

16   a moot point, here.  I will say that the reason the parties

17   discussed it is that at the time that we were negotiating the

18   Plea Agreement, we did not have information regarding the

19   outcome of a particular count that there is information now.

20          THE COURT:  Right, right.

21          MR. BURROWS:  So we were thinking, "Well, look, based

22   on this, this guy looks like Category II, even though the way

23   we calculated it's Category I."  The fact that since then we

24   have that additional information, it really makes, not just

25   that it would be a moot motion, but that the concerns that were

1    behind that motion have been satisfied by the PSI.

2         THE COURT:  All right.  So that's where we are.  I

3    suppose I'm asking, at this juncture, to let me hear from you,

4    but let me set this up so that I invite everyone to know what's

5    going on in my head.  Crimes of violence are not something to

6    be taken lightly, and it's not necessarily the case that I look

7    at a crime of violence solely to what did happen by way of

8    injury.  Because you know, swing and a miss, could -- is no

9    less violent than a swing and a hit, and a connection.  The

10   outcome is very different, but the conduct is very similar.

11   The harm is very different, but the conduct is very similar.

12        So I suppose all that I'm saying is that I'm looking

13   at this broadly, beyond the notion of the fact that the

14   security guard, if that's the correct term, and if not, then I

15   apologize, I just don't have the correct term at my fingertips,

16   had irritation of the eyes, because he was sprayed with

17   something that, for lack of a better term, we'll call it

18   commercial pepper spray.  It's still a violent act.  And when

19   you put it in the context of what was going on around it,

20   there's the cutting in line, which is not a big deal, people

21   cut in line all the time, and it causes people to get excited,

22   but he is asked to leave, and then he comes back, and there's

23   some comment being yelled in about bombing the place or

24   something like that, which leads to the attempt to take him

25   under control, which leads to the assault for which he has pled

 1   guilty.

 2          Around that same period of time, there is

 3   communication with, I believe it was, the landlord of his

 4   former residence, because he has been evicted, but it leads to

 5   a telephone harassment.  Let me make sure that that is right.

 6   Yeah.  A telephone harassment threat that is described at

 7   paragraph 42.

 8          Around the same time, there is a petty offense matter

 9   that is referenced in the report, and what it amounts to is

10   some ... telephone threat about setting fire to Colorado

11   Springs VA clinic, or running over people in the parking lot,

12   and now I'm referring to paragraph 16 of the PSR.

13          So, within this very short period of time, there is an

14   awful lot of aggressive noise coming from the defendant, and it

15   is not just noise, because there is a -- it culminates in an

16   assault.

17          At the same time, all of this happens after 55 years,

18   or so, of nothing, and a series of events which are well

19   documented and well laid out by both the probation department

20   and the defense counsel, in his motion, which is, the defendant

21   has had mental-health issues, and around this time, his wife

22   dies, he is evicted, he is -- it is apparently the case, Social

23   Security is telling him they need him to come in and do more

24   paperwork or else what he has by disability may be terminated,

25   and that's what he lives on, because is he unable to work,

1    since being determined disabled by the Social Security

2    Administration some time ago.

3            He is homeless, he has a child with some autistic

4    qualities, and so the question becomes, "How much of it is

5    violent guy, how much of this is a mental-health issues that

6    responded in the way that they did," to use the old saying,

7    "The straw that broke the camel's back."  And how much this is,

8    to be blunt about it, "A guy who just likes to bully people and

9    is a bit of an ass?"

10           I don't have a magic answer here, that's what I'm

11   trying to figure out, and so that's, in my mind, how this sits

12   when I listen and invite each of you to speak to me.

13           Mr. Burrows.

14           MR. BURROWS:  So, Your Honor, just to be clear, the

15   government is asking for 18 months of prison, but otherwise

16   agrees with probation department regarding the supervised

17   release and the up to six months of community confinement and

18   the other terms that they suggested.

19           THE COURT:  I should tell you that I talked to the

20   probation officer before the hearing.  It really was for a very

21   simple reason, it was -- Mr. Sullivan has summarized various VA

22   records and obviously I don't have them attached to anything

23   and I know that they are extensive records, and so I simply

24   wanted to know, from probation's perspective, had they seen the

25   records that you were referring and did they agree with your

1    characterization of them?  Mr. Sullivan, the answers were yes

2    and yes.  And so that was a simple point.  But when I was

3    talking to probation, I did tell them that it was my intention,

4    and I will tell you that it is my intention, to not impose

5    special condition number ... I want to say seven.

6            *PROBATION:*  Well, that's what you told me, but I

7    haven't confirmed that.  I will.

8            *THE COURT:*  I said that wrong.  It's not special

9    condition.  It's standard condition number -- I will tell you

10   what it is.  It's number seven.  It is the standard condition

11   that says, "You shall be employed, you shall work unless

12   excused by the probation officer."  I don't want to leave that

13   matter to the probation officer.  There's a lot of issues here.

14   I'm not saying he can't work, I'm not saying he shouldn't work,

15   but I think, given the determination of disability, coupled

16   with the other mental-health issues, which, at a bare minimum,

17   involve social problems, that requiring that as a standard

18   condition in this case, is inappropriate, and so I'm not going

19   to impose that condition.

20           *MR. BURROWS:*  And the United States is not

21   particularly concerned about that condition, Your Honor.

22           *THE COURT:*  Okay.

23           *MR. BURROWS:*  Particularly, given the relatively low

24   amount of restitution that is here.  Even if Mr. Gerber is --

25   is indeed disabled, he will get Social Security payments and

1    that could cover, you know -- one month of Social Security

2    would easily cover restitution hearing.

3         THE COURT:  I'm stalling you from what I actually

4    invited you up here to talk about.  Let me stall you a little

5    more.  Again, I'm also not going to impose special conditions

6    five, six and seven.  And the only reason I say that is, I

7    don't have any quarrel with the probation department's imposing

8    those.  They are pretty much standard, where there's a

9    financial obligation.  The financial obligation here, is very,

10   very small, and I think, you know, things like opening

11   additional lines of credit and accessing financial information

12   is probably unnecessary, in this case.

13        MR. BURROWS:  So I agree with that, Your Honor.  I

14   would note that the special condition does include an

15   exception, if he, in fact, is compliant with his payment

16   obligations.

17        THE COURT:  Oh, I intend to do that.  I mean, I intend

18   to, you know, require -- that's special condition number four,

19   that he be -- that he comply with the payment terms, but I

20   think the rest of this is probably unnecessary in this case.

21        MR. BURROWS:  That makes sense, Your Honor, and is,

22   frankly, not the main thrust of what I'm suggesting.

23        THE COURT:  All right.  I'm done interrupting you.

24        MR. BURROWS:  When I say that I agree with probation,

25   it's primarily related to the length of the supervised release

1    and the term of community confinement.

2              *THE COURT:*  All right.

3              *MR. BURROWS:*  At any rate, I want to note, first, that

4    defense counsel has made, I think, a good argument for time

5    served, and I commend him for doing so under these facts.  I

6    think that the thrust of the argument, though, is this is a man

7    who was stuck in a difficult, traumatic situation, who acted

8    out in an aberrant manner, over a short period of time.  He has

9    been taught his lesson by being sent to jail, and will not be

10   an issue going further.

11             Unfortunately, that is not a fair or true -- well,

12   it's an accurate, I suppose, interpretation of the facts --

13             *THE COURT:*  It's the interpretation that you don't

14   agree with.

15             *MR. BURROWS:*  I don't agree with it.

16             *THE COURT:*  All right.

17             *MR. BURROWS:*  And the reason is multifold.  First, if

18   you note, in the defendant's criminal history, his first

19   criminal conviction was in 2015, on the events of this case

20   occurred just about a year from today.  In 2015 he was

21   sentenced to probation, and he was sentenced to mental-health

22   and substance-abuse evaluation.

23             *THE COURT:*  Right.

24             *MR. BURROWS:*  That was his chance to really understand

25   where his conduct was leading him and to correct his course and

1    it did not, in fact, happen.

2            I would also say that while Your Honor has sentenced a

3    lot of cases, and every defendant gets up here and says, "I

4    have been taught my lesson.  I will never do it again."  And

5    sometimes it's true and sometimes it's not.  But the only way

6    the Court and the parties can really judge is based on the

7    defendant's actions and based on what the defendant has said

8    since then.

9            And here we have a defendant who, even while on

10   supervision, was not compliant with supervision and did things

11   his way and as the mental-health evaluation, of which there

12   will be many, indicated, simply has a problem with authority

13   figures, and does not want to comply and blame authority

14   figures for things, himself, he has done.  I don't mean to

15   suggest the defendant shouldn't be entitled to the guideline

16   reduction for acceptance of responsibility, but I do think it's

17   appropriate to say that his acceptance of responsibility has

18   been de minimis.

19           He has pled guilty, but in his most recent

20   mental-health evaluation, which occurred almost exactly a month

21   from day, he indicated that he was unjustly incarcerated.  He

22   also indicated to probation, that while he would comply with

23   the Court order for mental-health evaluation, he doesn't need

24   it, and he would only do it to, you know, get the sentence that

25   he wanted to get.

1          THE COURT:  Believe me -- I shouldn't say believe me.

2     I should say, that doesn't surprise me.  There are -- it is

3     difficult to expect rational responses from people who are

4     dealing with things that impact their rationality.

5          MR. BURROWS:  I think the -- the point, Your Honor, is

6     this defendant has not demonstrated, in any way, that he is

7     particularly remorseful or understands that his actions have

8     consequences, and that it's not someone else's fault that he

9     did what he did.  He may comply for the sake of compliance, but

10    will not be particularly chastened by the situation.  He has

11    been in jail for some period of time, and yet, again, less than

12    a month ago, indicates that he has not been chastened by the

13    situation, that he believes he is unjustly incarcerated and

14    that is the evidence that is before the Court.

15         It is clear that the defendant has some mental-health

16    problems.  I do think it's interesting that defendant quotes

17    from a mental-health evaluation at the VA where the doctor

18    says, "Well he is not particular risk for" --

19         THE COURT:  I know what you are referring to.

20         MR. BURROWS:  -- "for further violence," and then we

21    have the charges we have here.  I note, as well, the defendant

22    points out, "Well, look, this isn't really about protecting the

23    public from further crimes of the defendant, because while this

24    incident occurred on January 23rd, he wasn't arrested until

25    later."

1          Let's be clear, this incident occurred on January

2    23rd, but the additional incident, where he texted threats to

3    the VA employee, was discovered on February -- on February 12th

4    and within less than 24 hours we had a warrant from

5    Magistrate Judge Mix.

6          The government is concerned about the defendant's

7    further crimes, and as the Court indicated, this is a

8    continuing series of events, continuously escalating series of

9    events.  So while one individual incident may not have been

10   enough for an arrest warrant, certainly as a whole it indicates

11   a defendant who is a danger to society, and frankly, based on

12   his attitude, continues to be.

13         I would note, as well, that this defendant is not --

14   has a history of being noncompliant with psychological

15   treatment.  So at some point it doesn't matter whether the

16   cause of this was a psych issue or not.  If he is not going to

17   deal with it, he was terminated from psych treatment while on

18   supervision in this court in June 2018, because he wouldn't

19   comply.

20         He has indicated in the -- in his interview with

21   Dr. Fukutaki, he knows what the best meds are.  The VA

22   records --

23         *THE COURT:*  I'm clearly exaggerating your position,

24   and I know that you will respond appropriately, but what I hear

25   is, "Well, he won't take medicine, I'm going to lock you up."

1    Because even though you may need treatment, if you won't take

2    your medicine, even -- and many, many people with mental-health

3    issues are reluctant to take their medicine.  They don't like

4    the way it makes them feel, things of that nature, but because

5    he won't take his medicine, I'm going to lock him up.

6          *MR. BURROWS:*  That's true, Your Honor, but one of the

7    concerns under 3553(a), it's not being locked up for failure to

8    take your medicine.  It's to protect the public, incapacitate

9    you from committing other crimes, which you are going to commit

10   if he doesn't take medicine.  And this defendant has indicated,

11   he has no interest in complying with treatment.  VA indicated

12   medication noncompliance before this incident happened, and

13   they had talked to him about it.

14         Again in paragraph 82 he tells probation that he will

15   comply, but he doesn't really think he needs it, in the

16   presentence interview, after he already pled guilty to this

17   crime.

18         I think it's -- so while he needs mental-health

19   treatment, the defendant's attitude is not the attitude of

20   someone who is going to get any effective benefit from being

21   out of jail and being treated, because, frankly, he is probably

22   unlikely to adequately comply with that treatment.

23         *THE COURT:*  And what -- I understand there's a benefit

24   to the public.  Let's put that to the side.  What benefit will

25   he receive from being locked up for a longer period of time?

1          MR. BURROWS:  Your Honor, the government's position in

2     this case is primarily driven by incapacitation of the

3     defendant and deterrence of defendant, and others, and just

4     punishment for the crime.  The benefit to defendant, is

5     minimal, nonetheless, there is treatment available in jail.  If

6     the defendant really -- if the government is misinterpreting

7     what he is saying, or if he has changed his mind in the month

8     since he told his psychiatrist that he was unjustly arrested

9     and in fact he wants to seek treatment, that treatment is

10    available, in prison.  So, there's that.  But there's also the

11    question, as the Court has indicated, whether this is about a

12    guy who just snapped or whether this is a guy who is just a

13    continuing jerk and is going to act this way no matter what.

14          I do note, first, as I mentioned, there was the

15    assault --

16          THE COURT:  I wish I had -- I wish I had your impulse,

17    in terms of the noun you chose to use.

18          MR. BURROWS:  What -- I don't know --

19          THE COURT:  Because mine may be a little more vulgar

20    than yours.

21          MR. BURROWS:  Fair enough.

22          THE COURT:  Six and one half dozen of the other.  I

23    prefer yours, as well.  I adopt yours.

24          MR. BURROWS:  Okay.  Fair enough.  So the -- I note

25    that this is a guy who has a course of conduct of using threats

1    and violence, not just as, "I'm mad as hell, I'm not going to

2    take it anymore," but specifically, threats and violence to get

3    his way, which indicates to me --

4            THE COURT:  I agree with that --

5            MR. BURROWS:  -- more of a level of planning, rather

6    than just a spontaneous, "I can't take it anymore.  My brain

7    can't handle this."

8            We have the apartment harassment charge, which was an

9    attempt to either punish or get out of an eviction.  We have an

10   incident at the Social Security, where the defendant goes,

11   thinks he is entitled to cut in line, then when he not able to

12   do that, decides to punish someone for standing up to him.  I

13   think it's important to note that the defendant goes back to

14   his car, returns to Social Security to scream a threat.  I

15   don't know if he got the pepper spray when he was in his car,

16   but nonetheless, the defendant had a chance to just be an angry

17   guy and walk away and he didn't do it.

18           There's the incident at the VA where it appears, to

19   me, to be triggered by the fact that the VA is not working on

20   his case as quickly as he would like them to, in perhaps some

21   secondary thing related to whether the employee at the VA was

22   open to his romantic advances or not.

23           There's phone threats, which seem similarly related.

24   Even after the arrest, while he was in prison, he threatens

25   suicide, if he doesn't get a time-served sentence here, which

1    frankly, Your Honor --

2           THE COURT:  I interpret that exactly the same way you

3    do.

4           MR. BURROWS:  It is another threat to get what he

5    wants.

6           THE COURT:  I know.

7           MR. BURROWS:  And so it seems to me that there is a

8    great portion of, "I'm just a jerk, and I am going to do what I

9    want to do," wrapped up in this.

10          Is there a mental-health issue?  Absolutely.  Is that

11   mental-health issue detrimental to defendant's conduct?  Sure.

12   But it does seem like, even absent mental health, the guy is

13   just, at his core, a jerk, and is going to do what he wants to

14   do when he wants to do it, as much as he thinks he can get away

15   with, and that's what he has demonstrated; A, prior to these

16   incidents, with his earlier assault charge; and B, even after

17   his arrest, so that coupled with the fact that this is a

18   defendant who has not indicated any real desire for -- to

19   comply with treatment, who thinks, he knows best about

20   everything, who, based on psychological evaluations, has

21   intense reaction to authority figures, and a key point, tries

22   to blame authority figures for things that he has done, who, in

23   paragraph 77, social worker indicates that he is manipulative

24   not just with others, but with his son too, with everyone he

25   deals with, even a person who is a member of his family and who

he presumably exhibits some love and care for, is still

manipulative in that situation.

Eighteen months of prison seems like an appropriate

sentence here, that would give the defendant time to seek

adequate treatment in prison, if indeed he decides to

participate in that, which is, at this point, unclear, and

which is a risk that the Court should not take.  A person who

demonstrated he is not compliant with treatment, he is a danger

to society, to give him one more chance and let him out,

without him demonstrating any significant commitment to that

sort of treatment simply would not meet the requirements of

3553(a).  Would not protect society from further crimes.

Certainly would not promote deterrence in these situation.  The

defendant can be ... just completely unremorseful for his

conduct, and still get a time-served sentence on a violent

crime, and it would not be a just punishment for the offense

because, as the Court notes, the offense is not always just

about the harm that was inflicted.  I have -- Mr. Gerber used

the weapon that was available to him, but I have no doubt that

if a different weapon was there, he would have used it.  I

think that's similar to the --

THE COURT:  That is the bogeyman in the room.  I'm not

saying that it's a fair comment, but I'm not saying it's an

unfair one either.  The question -- I'm not going to say he

would have killed that guy and I am not going to say that he

1    tried to, because I don't think the facts support that, but --

2    and I am saying this Mr. Sullivan, just to be as transparent as

3    possible, about the things that everybody knows gets thought

4    about.  If you have somebody who has demonstrates

5    aggressiveness, and is verbalizing extreme forms of violence,

6    running people over in a parking lot, blowing up the building,

7    things of that nature, and that person begins to move from

8    wagging his tongue to actually engaging other people, it

9    becomes a more complicated sentencing issue, because now I'm

10   looking and saying, is that an idle threat or is that something

11   that's in his repertoire?  That's all I'm saying, is that it is

12   something that is part of this matrix of intertwined events

13   that involve conduct and mental health and history that I'm

14   trying to sort through.  And I am just being as blunt as I can

15   be, and I appreciate Mr. Burrows being equally blunt in terms

16   of his perception of things.  So I hear you.

17        MR. BURROWS:  So, at any rate, Your Honor, I think

18   that's exactly it.  I agree that Mr. Gerber, I don't think he

19   had any intent to kill the person that he did or would have,

20   but I certainly think he had an intent to inflict whatever

21   damage that he could at the time, and had he not been wrestled

22   to the ground probably would have tried to inflict more damage

23   in that situation, given what he had, his fists and his feet.

24        So at any rate, I think what the -- what the Court has

25   verbalized here is an important consideration here, and

1   defendants -- defendant's course of conduct has been one of

2   escalating threats, that ultimately led to violence, and given

3   his attitude certainly, there's very little reason to think

4   that that will be deescalated by giving him a time-served

5   sentence.

6           THE COURT:  All right.  Mr. Sullivan, please.  The

7   floor is yours, and I would ask that you be equally as blunt.

8   And again, I'm not trying to get you to go in any particular

9   direction.  I just think it is a better process when you

10  understand exactly what's going on in my head, rather than us

11  engaging in, you know, coded language speak, and so that's the

12  only reason that I said what I said at the outset it is what is

13  going on in my head, and I would think that that's hardly a

14  surprise.

15          MR. SULLIVAN:  Judge, I never have any trouble when

16  you come in here and tell us what you are thinking.  It saves

17  us time, saves you time we don't stand up here and talk about

18  some fantasy about what could have happened -- I mean, we get

19  right to it, and that's the point, and that's kind of how I

20  wrote everything up for you, and I didn't spend -- I have got a

21  page of notes, because you have read everything, and so, you

22  know the -- what I tried to do, when I wrote up the memo, was

23  to try to distill down all of the reports on this guy, because,

24  frankly, 90 percent of my cases I can't explain why my

25  defendants do what they do.  I sure as heck can't say what they

1    are going to do in the future.  It's crazy and you will hear,

2    "He is the best client I ever had.  I'm sure he is going to be

3    great we have had so many wonderful talks, and you trust me,

4    Judge," and the attorney never sees the guy again until the

5    supervised-release violation comes up.

6         But what I tried do in this case, and it took me a

7    long time to get through this and try to parse through it all,

8    because the elephant in this room is the guy said some stuff

9    that you just can't believe comes out of people's mouths.

10        *THE COURT:*  Right.

11        *MR. SULLIVAN:*  Obvious response that any lawyer is

12   going to say, "Well, that is not what he is charged with.  He

13   has a First Amendment right."  It's going to influence how we

14   approach somebody, because we are going to take what he says

15   and say, "Look, if that's what you really think, what is going

16   to prevent you from acting on that in the future?"  And you

17   know, "Are you an ass," or -- what you and I were both

18   thinking -- or, "Are you somebody that needs some help?"

19        *THE COURT:*  And let me be -- let me be even more

20   direct.  If he doesn't like the government, he is not the

21   first.  If he has got an inappropriate relationship with women,

22   he is not the first.  If he don't like black people, who cares,

23   he is not the first.  And with regard to all of those, he is

24   not going to be the last.  So I'm not reacting to any of that

25   on its own merits.  I'm reacting to it only as part of this

1  broader package of aggressive language and conduct, and so, you

2  know, the rest of it I understand, but I'm just being more

3  blunt than I can -- than I need to be.  I don't give a rat's

4  patoot about what he thinks about minorities, women or the

5  government.  Don't care at all.  Unless it's part and parcel of

6  something that is more appropriately something I should be

7  concerned about.

8          MR. SULLIVAN:  Right.  Future predictor of violence.

9  If you don't like Asians, you are more likely to act out on

10  Asians, if that's your core belief.

11          I have got to tell you, I got appointed on this case

12  because Ms. Butterworth (sic) -- and had run-ins --

13          THE COURT:  I have got to send her that transcript.

14          MR. SULLIVAN:  Butterton, I'm assuming you believe.

15  It's been a really long week for me.

16          THE COURT:  That's fine.  I might even start calling

17  her Ms. Butterworth.

18          THE COURT:  All right.

19          MR. SULLIVAN:  I mean, I call her Mary.  Can I step

20  back and do this again?

21          THE COURT:  Yeah.  You can.

22          MR. SULLIVAN:  So, I went down to -- I went down to

23  see this "monster" when he was at the community corrections

24  down in the Springs, and I was ready, because I knew I was

25  going to a halfway house, and I didn't know if I was coming up

 1    against a guy who was just going to start screaming at me,

 2    throwing things at me.  I went down there, I had a black

 3    T-shirt on, I had jeans, I had boots, and I went in there and I

 4    wasn't going to take anything from anybody, and I was just

 5    going to say "Look, you are this little fricking guy from the

 6    Midwest, if you are going to come at me, the way you were

 7    coming at her, I'm going to pound your head on the table, if

 8    there's no more relationship after that, then there isn't.  You

 9    can get another lawyer."  I am too old to go down and listen to

10    somebody yell at me about injustice, frankly.  And so I was

11    ready for that, and I will admit that to you.  But that's what

12    I was thinking, because I didn't know what to expect after

13    reading this stuff, knowing what a good lawyer she was and is.

14         And so I sat down with him, and I did what I usually

15    do, which is, I just say, "All right.  Tell me about your life.

16    Tell me where you come from."  I'm from Detroit, and so I have

17    got pretty good experience in the midwest.  He tells me he is

18    from Kenosha, he has this thick north Chicago accent.  I'm

19    thinking, okay, let's talk about.  So he tells me about -- he

20    tells me about his -- a lot of times what lawyers do, they like

21    to talk at people, give them a bunch of advice walk away, the

22    client doesn't understand a word they just said, because we

23    don't take any time to listen to them, because we are too busy.

24         So he talked about -- immediately, we just talk about

25    his whole history and how did this start.  How did you get

1    here.  You know, he talked about -- and I put it all in the

2    motion, so I won't go over it all with you, but he talked about

3    meeting Tammy Jo in Kenosha, and he talked about how they were

4    both cab drivers, and he talked about how she had two kids from

5    two different guys.  One of the husbands was murdered, I have

6    got a stepson, thankfully there was no tragic history like

7    that, but I thought, "Boy, that's a tough start," you know,

8    when you are young and you are a cab driver and she was heavy

9    and she was diabetic and he took her in.  They -- they

10   developed a relationship.

11        At the same time, his mom passes away and he tries to

12   take over the house.  He tries to run the house for mom

13   afterwards and he loses it.  In the estate.  He goes bankrupt,

14   so he looses that.  So now he has a wife -- we'll say a

15   high-maintenance wife, we will say, with the two kids, and he

16   doesn't have enough money to support anybody, and so she starts

17   having issues, and again, I tried to track, you know, how could

18   somebody go 55 years crime free, 55 years crime free, and then

19   suddenly turn into a bad guy?  And I just thought that doesn't

20   just happen, unless something happens to them, and maybe their

21   reactions to it are inappropriate or maybe there's a physical

22   aspect to it, that they don't anticipate.  But, you know,

23   that's when he moved -- they decided, let's get out of the

24   Kenosha.  Economically it wasn't viable at the time, so they go

25   to Arizona.  They go to -- I forgot -- Nevada, and then they

1    finally land in the Springs, he gets a job at Hobby Lobby.

2            Well, how are you going to support a family of three

3    working at Hobby Lobby is difficult, and so then he moves up to

4    the Sisters of St. Francis.  That is a nice campus there.

5    Catholic campus.  Some retiring nuns that live in the top floor

6    of one of the buildings, but it's not what you would call --

7    it's not going to be a cash cow for him.

8            Then, as you kind of track what he is doing, as the

9    years, kind of, start taking a toll on him, he is a smoker, you

10   know, and she attempts to kill herself, you know, and then he

11   starts trying to put it together, and just as that starts

12   happening, he has a heart attack.

13           And so what I did with this memo is I -- I was just

14   trying to track and see if I could put together, factually,

15   what happened, so that I may be able to track him emotionally

16   to where he ended up.  So I distilled it down quite a bit.  You

17   can see that in 2010 he starts out, he starts making complaints

18   about having some difficulties, and they diagnose him with

19   anxiety, but normal affect, whatever that means.  You know,

20   basic -- what the U.S. Attorney and I may be going through now.

21   Basic anxiety going through, you know, tough times, but in

22   general, they prescribe -- prescribe to him Citalopram,

23   diazepam and amitriptyline.  Amitriptyline.  I didn't even know

24   they used that anymore, but he starts taking it.  Then you can

25   see that he gets a mood disorder within a year, and they tell

1   him to stop taking the Citalopram because he starts getting --

2   and then put him on Depakote, then he gets pancreatitis from

3   that.  It starts to snowball on him.  Over the years I counted,

4   because we keep hearing back and forth about, "He doesn't want

5   anymore help, he doesn't want anymore help, he doesn't think

6   anything is wrong with him."  He reached out at least 20 times

7   to the crisis line, to the -- you know to -- to Telepsychiatry

8   20 times.  He was asking for consultations.  He showed up at

9   mental-health clinics, was trying to have something, some kind

10  of treatment, some kind of help.

11          So that, to me, kind of flies in the face of the guy

12  that is an ironman and everything he has done is fine.  He has

13  been reaching out for years.  If you look at the number of meds

14  they have.  I don't know what a Telepsychiatry consultant will

15  do, but I imagine it's, "Here, take this, see if this works,"

16  that happened a number of times with him.  He was on all kinds

17  of medications.  So when he says, "I know which medications

18  work for me, which don't."  How many different health-care

19  providers examined him over those eight years, he must have

20  talked to ten or fifteen different people, and it's not their

21  fault, but it's the fault that when you have too many cooks,

22  you know, maybe you have got a problem.  And so I -- as you can

23  go through my little timeline under 12, tracking that, you can

24  see things start to escalate on him.  And especially when, you

25  know -- and so he is less and less able to handle what's going

1    on.  He is moving around from apartment complex to hotels.  He

2    is trying to maintain some kind a stable residence for his

3    wife, who is not working now.  She attempts suicide.  She is in

4    a home for a month.  He finally gets full disability.  He

5    claims that at the end of December, they do it as of, I believe

6    it's August or June of 2012.  Okay.  So he is now disabled,

7    which is going to restrict him from being able to do some of

8    the things he wanted to do, which is going to be frustrating

9    for a guy like Mike, who prides himself on being a caretaker.

10   He always wanted to be a caretaker, and he has blown it every

11   time, and that really adds to his frustration.  You know, he

12   might -- tried to take care of mom, that didn't work.  He got

13   ostracized from his family, lost his job, moved around all of

14   these different places, his wife is still upset.  One of the

15   kids, Jeremy, won't talk to him now.  He has got his other son,

16   who has the autism issues, but as he said, and he said in his

17   presentence report, he says, "We don't have any steps in our

18   family."  He is very firm in his belief about what a man should

19   do in taking care of his family, and the fact that nothing pops

20   up for 55 years, maybe want to look and put all of this

21   together, which I'm being redundant.

22        If you track it from 2010, you can see things started

23   to escalate.  In 2011 his kid gets attacked by a dog.  Mike

24   dives on the dog, pit bull or something, something pretty

25   aggressive, cops come up, they beat him and everybody gets beat

1    up in that whole situation.

2            So this is a guy with a bad heart, this a guy who is

3    about to be fully disabled, who goes through that, wipes him

4    out.  It took him out.  I couldn't find the PTSD diagnosis

5    other than what my client tells me, but that really started to

6    escalate things to the negative, as well.

7            And so the -- the following year, is the heart attack,

8    the disability, and so then it kind goes quiet for a couple of

9    years, and between 2013 and 2015 I couldn't really find

10   anything what was going on.  So apparently things had

11   stabilized a little bit.  And then he tries to kill himself.

12   He is in -- in his hotel room with the family, she is yelling

13   at him, they are out of the money and he just takes a knife and

14   he tries to kill himself and he hits his ribs several times.

15   They take him to the hospital.  He tries to choke himself to

16   death at the hospital.  Then he tries to light his gown on fire

17   at the hospital.  There's a confrontation there and that's his

18   first case.

19           So -- but after that, again, it kind of calms down

20   again.  It's between, for the next year and a half, you don't

21   hear a lot, really couldn't track anything down, and then what

22   really happens, what I'm centering everything on is 2017.

23   Tammy Jo goes into the hospital in January of 2017 -- or into a

24   nursing home.  Okay.  It's a government-funded nursing home,

25   she is not getting the best treatment.  He goes and checks on

 1   her all the time, because that's it for him.  She has been with

 2   him for 27 years.  She is it.  She is the only thing that has

 3   been with him through everything.  So he goes in there and he

 4   sees the kind of treatment she is getting.  She is getting

 5   injuries.  Things aren't healing right.  So he is going in

 6   there and he is starting to voice concerns.  Nothing bubbles up

 7   to the point of a criminal case, but it starts to bubble up

 8   inside of him and he starts reaching out in July to a

 9   mental-health clinic.  He starts calling them up saying, "Look

10   I have got problems here, and I need to deal with it," and

11   right at that same time he gets -- they double his rent, they

12   are going to sell the apartment complex, and he yells at the --

13   he goes off on the manager and he -- that's the second case

14   that he pulls.

15         There's three different welfare checks on him before

16   the confrontation with the -- with the manager.  He calls the

17   VA line.  Whatever he tells them, scares them enough to make

18   them believe that there's something wrong with him, and that it

19   needs to be addressed, blows up and says all of things that he

20   said to the apartment complex.

21         So now you are in late summer 2017.  She is still in

22   the hospital.  Mike is now living in his truck with his son.

23   It's warm enough so that they are living -- also have a tent.

24   They live in the woods in and around the nursing home.  He

25   wouldn't leave the nursing home in general.  They are sleeping

1    in the parking lot, sleeping in the woods.  So he is homeless.

2    And he starts calling, yet again, he calls the VA crisis line,

3    says "I'm having real trouble here, if you can help me," they

4    diagnose him with major depressive disorder recurrent, severe

5    they load him up with Duloxetine, Bispirone and Trazodone, then

6    they reevaluate him about a month or so later, and again he is

7    still in the woods.  He is still in the truck.  Starting to get

8    cold now, and so, again -- and he is with his son, and his son,

9    gets in a car accident, breaks his arm.  He is in bad shape at

10   the time.

11        So Mike is starting, again, the stress levels are just

12   bubbling over, and he ends up -- he has got more problems, and

13   ends up -- they put a loop recorder in his chest, because his

14   heart starts messing up again.  So now you are getting towards

15   the end of November, beginning of December, and the Social

16   Security threatens to cut his benefits, and so he is thinking:

17   I'm homeless.  If you cut my benefits, I don't know what I'm

18   going to do," and he is, again, struggling with the depressive

19   disorder at the time, all of these new medications.  I don't

20   know what the effect was.  I couldn't really find any

21   documentation that something was negative about these drugs,

22   but he goes down there and he fixes it.  He goes down to the

23   social security office they, reestablish the benefits, so

24   nothing happens at that point.

25        But towards the end of December of that year he calls

1    them back up again and says, "I'm having all of these suicidal

2    thoughts.  Things are not going well.  Can you help me?" And

3    they ask him questions, "Where are these coming from?  Where

4    did this begin?"  He said, "I don't know.  I just know this is

5    what I feel."  So this is the 20th time he has reached out in

6    the last few years.

7            And so then in -- and then about a month later she

8    dies.  She falls, hits her head pretty bad, Mike could never

9    get the full scoop on what really took place.  Obviously they

10   were concerned about liability, things like that, but she dies

11   and that destroyed him.  I mean that was it.  I mean, that's

12   what he was living for.  I mean, he was -- he was like an eagle

13   circling the nest the whole time she was there for that whole

14   year.  Whether it meant, I'm sleeping in the woods, I'm

15   sleeping on the front porch, I'm sleeping in the car, I'm not

16   leaving her and she died, and within the very next day, he

17   called the crisis line, again, says, "Look I'm going to -- I

18   don't know what I'm going to do.  I think I'm just going to

19   commit suicide by cop.  I just don't have anything left here."

20   And then he gets the letter from social security.

21           I mean the timing couldn't be any worse, where they

22   say, "Okay.  By the way, we are going to pull your benefits if

23   you don't fill out this paperwork," whatever it was.  It was an

24   inconvenience at a point where he didn't have any kind of

25   patience left for anything like this.  He dealt with it a month

1    before, there hadn't been any issues, but now, a month later

2    after she has passed away, he has reached out for help several

3    times, he is not where he needs to be.  And so if you watch --

4    all watched the videos and he walks down there, and you can see

5    he comes in, he walks in front door, he gets in line, there was

6    a long line, you see him yelling and chirping at the people,

7    and then he is asked to leave by the two guards.  They walk him

8    out, and they don't shove him, but they say, you know, you can

9    see them pointing, and so he is yelling at them, he is talking

10   to them, he has his folder with him, he throws it down -- Dan

11   can correct me if I'm wrong on any of this -- throws his folder

12   down, picks it up, then walks away.  You don't see anything for

13   awhile.  I don't know how long it was, but the next thing you

14   see on the frame, he comes in, he doesn't really even cross the

15   threshold.  He walks in -- maybe he crosses the threshold, but

16   both guards take him out, one guard spins him around, is

17   walking him, you know, forward, towards the post, and then he

18   is going to arrest him, because it's trespass now.

19   Understandable.

20          So he -- as he is holding him, he leans over to his

21   mic, he whispers in asking for back up, of course.  So as he is

22   doing that, that's when Mike turns around with his can of mace

23   that he tells me bought at Walmart®,  and sprays the guy in the

24   eyes.  Then the other officer comes out, and they take him down

25   and wrestle down with him for a little bit, handcuff him and

1   that's the arrest.

2          So I guess who am I to interpret anything from that

3   day, but it wouldn't surprise me if he went there, the second

4   time, in order to blow the place up or to go in there with a

5   can of mace and cause some kind of harm.  It looked to me that

6   he didn't like the fact he was getting arrested or he felt

7   threatened and he turned around and used this can.  So he is on

8   the ground and he gets arrested and then he is released he

9   sends the awful texts a month later, which I mean --

10          THE COURT:  It is what it is.

11          MR. SULLIVAN:  Sick, pathetic, and that kind of leads

12   me to not being surprised -- me the amateur psychologist --

13   that when he is diagnosed in February, by Michael Canham.  He

14   hits him with, I mean, you know, not only all of the physical

15   issues, heart problems C.O.P.D., he hits him with

16   bipolar-related disorders, anxiety, obsessive compulsive,

17   neurocognitive.  It is pretty clear to me, because this was a

18   guy acting against his own interests, every time he opens his

19   mouth.

20          He wants his Social Security benefits on time.  He

21   wants to have a place with his son.  Everything has changed now

22   that Tammy Jo is out of his life, and yet he is acting against

23   his own interests by saying such ridiculous things, knowing

24   it's not going to get him anywhere.  In fact, it's going to put

25   him in a worse place.  That's a cognitive disorder.  When you

1    are acting against yourself interest to that level, you are not

2    in control of what you are doing.  You are just mouthing off.

3    He is not -- I mean, like I said, I was ready for the biggest,

4    tough, angry guy.  I was ready for a shaved-head guy with

5    tattoos on the back of his head that's going to tell me all

6    about white supremacy; that's what I was ready for.

7            It's this little guy from Wisconsin, who is mad as

8    hell because his benefits got canceled, and his wife died, and

9    he can't seem to shut up, and so it's telling that as -- as

10   time has gone on, since this happened, you know, he did seven

11   months in the halfway house, then he did almost five now in

12   jail.  He is a different guy.  You know, it's completely

13   different.  I'm happy to see that.  I mean there's no question

14   that the anger is gone.  The disgust is there, the confusion is

15   there.  The trying to piece together what happened is still

16   there.  He feels so much guilt because she is in a funeral home

17   and he can't do anything about it, and basically, his whole

18   mourning period has been either in a halfway house or in a

19   jail.  It's his own making, but nevertheless it's going to take

20   a toll on you.  You are going to think, "Gosh darn it, I wasn't

21   that bad," and you get a few jailhouse lawyers in your ear,

22   then of course it wasn't that bad.

23           So at least what I tried to do, Judge, for everybody

24   here is track it and try to see, okay, you can see where it

25   came from, you can see what it led to, the facts are the facts,

1    he has nothing before 55, and if somebody is a jerk for that

2    many years, it's amazing that they avoid all bar fights, that

3    they avoid all road-rage incidents, but he did.

4            And so he -- so I hired a psychologist, and I asked

5    him, "Look, just do a mental-health evaluation.  I just want to

6    know what I'm dealing with.  What kind of hand have I been

7    dealt here," and thank you for approving the funding.  He goes

8    in there, does this evaluation of him, which I didn't ask him

9    to do.  I didn't ask him to do this -- this violence-risk

10   appraisal guide.  I just -- I said I just want you to meet with

11   him a couple times, talk to him, see if you can give me some

12   insight into what makes this guy tick.  So I get this letter, I

13   get this page-and-a-half letter, "This is what I saw, this is

14   what I found," blah, blah, blah.  I thought, okay, everybody

15   has seen.  And then he says, "But I ran him through this

16   violence appraisal guide," and it was helpful because it shows

17   that, you know, he is considered under -- at least with

18   everything that happened, with everything that we've seen, he

19   is considered a low risk for future violence, because the storm

20   has passed that caused all of this.

21           You know, he may be homeless again some day, but he is

22   never going to lose his wife.  He is never going to go through

23   so much of what he has gone through to this point again, and he

24   certainly learned where it gets him.

25           So, you know, I -- I can't predict the future.  I mean

1    I can't tell you that what's going to happen, but I can point

2    out that, factually, how he got to where he is, what the

3    diagnoses were along the way.  How everything escalated.  It

4    was kind of a caustic explosion.  The timing of the letter.

5    Had the letter not come at that point, this wouldn't have

6    happened.  Had his wife not passed away, at that point, this

7    wouldn't have happened.

8          And so, in terms of, if we're looking at, "Is he going

9    to be a danger in the future."  Well, we have a psychologist

10   that says no.  Do we have -- what kind of violence are we

11   talking about here?  It's of course mental-health based.  You

12   know, he had -- if he wanted to go in there and raise holy heck

13   on that day and hurt somebody, he could have done it the first

14   time.  I mean, he went there, the line was long, he stood in

15   line for a little bit and then he left.  And I mean, if he was

16   really looking to just, "I'm going to go there and hurt

17   somebody," he would have done it then.  And if -- if he didn't

18   reach for his mace, until he was pushed up against the post and

19   being arrested.  The cop didn't do anything wrong.  He just was

20   radioing for backup, and that's when Mike pulled his mace out.

21         So I don't see that this is an act where he says, "I'm

22   going to go down there and I am going to let them have it,

23   because I'm so frustrated."  He wanted his money, and he knows

24   you are not going to get your money if you offend all of the

25   people that are cutting the checks.  Another cognitive

1    disconnect there.  I think that's the problem.  He has to be --

2    he has to be reacquainted with civility, and he has to be able

3    to look past what he going through, and become civil again, and

4    whether somebody needs to sit down, not just a crisis line or

5    not just Telepsychiatry, but somebody needs to sit down with

6    him, hammer out where he is now.  If all of these diagnoses are

7    current, if he is truly bipolar, neurocognitive disorder and

8    depressive disorder and obsessive compulsive disorder, clearly

9    that needs to be addressed, and I disagree, respectfully, that

10   something like that is going to happen, to any kind of degree,

11   in a jail.

12          But if we're worried about if he is going to offend

13   again, we have got a report that says unlikely.  If we are

14   worried that he needs to be deterred again -- I mean he has

15   lost everything.  You know, his son is now in Mississippi.  You

16   know, his wife is gone.  He doesn't have any money left.  I

17   mean, there's nothing left to lose.  And so if you look back

18   and say, you know, "Has he been deterred?"  Well, he doesn't

19   have anything left, except his freedom.  That's the only thing

20   he has got, try to rebuild whatever kind of life he can

21   rebuild, and given his physical limitations, a lot of the

22   things that were options for him ten years ago aren't anymore.

23          So I don't know that it's going to be -- you know, it

24   feels good to say, "Well, let's get the message across to him,"

25   beat him until moral improves kind of stuff.  I don't see any

1   of the psychological data or factual history really points to

2   that.  Again, I can't predict the future, and I am not a

3   psychologist, but when somebody is acting against their own

4   interests, that's reflective of a cognitive disorder, and

5   that's of course what he has been diagnosed with.  We address

6   that, we address the problems.  And I am happy to answer any

7   questions.  I went way longer than I intended, but...

8         *THE COURT:*  I don't know that there is a question.  I

9   mean, ultimately, I think it is fleshed out, but it remains

10   where I kind of ...

11         *MR. SULLIVAN:*  Started?

12         *THE COURT:*  Was shining the light at the outset.  I

13   mean, each of you, obviously, holds to one aspect of these

14   events as being more critical than other aspects, and I don't

15   think either one of you is wrong.

16         So let me ask, Mr. Burrows, I will give you a minute,

17   if there's something that Mr. Sullivan said that you think

18   needs to be touched upon or corrected, but I don't think beyond

19   that.  I see the disagreements, and it's -- it's an ongoing

20   ping-pong game in my head.  I get it.  I get both sides.

21         *MR. BURROWS:*  I think, Your Honor, I mean, part of the

22   advantage of being government counsel is that your duty, as has

23   been explained throughout history, is to do justice rather than

24   necessarily to win the case.  I do think it's important to note

25   that Mr. Sullivan's tracing that defendant tried 20 times to

1    reach out and get treatment and has a history of treatment is

2    absolutely worth the court considering.

3        I would note, however, the most concerning fact at

4    present, as we sit here today, about his mental health and the

5    efficacy of any treatment that he might receive, is his

6    statement.  Less than a month from day, that he believes he is

7    unjustly incarcerated and essentially that this is all someone

8    else's fault, and a person who still, now, after nearly a year

9    of legal proceedings, to say that and then come in, less than

10   30 days, say, like, I have learned my lesson, simply doesn't

11   make any sense.

12       THE COURT:  All right.  Mr. Sullivan, if you and

13   Mr. Gerber would please go to the podium.

14       Mr. Gerber, this is your opportunity to speak to me.

15   It has been -- I can only imagine how odd it is to sit for an

16   hour and ten minutes, and have three people have a discussion

17   about you and what you are and you don't get to participate.

18   This is your opportunity, and you get the last word with me, to

19   say anything that you want to say.

20       I tell you a couple of things; one, there is no

21   requirement on you that you comment on anything.  So what you

22   have to say, if anything, is completely up to you.  Two, I

23   would not waste one nanosecond over things like word choice or

24   how do I say this.  I'm not a delicate flower, and so, I'm not

25   listening to the content of what you say and word choice or if

1    it's in-artfully expressed.  I will -- I will work past all of

2    that.  None of that is, at all, important to me, and it is not

3    worthy of any of your attention either.  Okay.  Floor is yours.

4         *THE DEFENDANT:*  Well, I appreciate that, Your Honor,

5    because I'm not a very articulate speaker, and I gave my

6    statement, my testimony to my lawyer, and he has wrote it out

7    in court to you, which I'm sure you have read.  I could amplify

8    some of the answers better.  I could expand on some of them,

9    but I don't think that's necessary.

10        Some of the things that are -- that are brought out

11   here are brought up by people that are, as my first lawyer did,

12   trying to be a psychiatrist herself, determining my competency,

13   for the first trial.  Now, I got the prosecution and the

14   probation officer and the actual psychiatrist that I talked

15   with have completely different opinions from what they have.

16        And I never said that I'm not trying to take any -- no

17   responsibility for my actions, because I admitted I did what I

18   did.  Everything that they accuse me of, pretty much, I have

19   done.  I have done it, and I have admitted to that.  But they

20   are missing -- it's not all my fault.  I don't want to blame

21   everybody, but it isn't all my fault.  In the last year, that

22   last year, happened, I did lose my apartment.  I was taking

23   care of my wife.  I lost my apartment, because they almost

24   doubled my rent.  They didn't double my Social Security.  I

25   lost my rent, and we were trying to find an apartment.

1    Apartment after apartment, they would charge us a hundred

2    dollars every time we had to apply, just to get rejected

3    because I didn't make enough money on Social Security.  I had

4    to borrow money to live in these motels, he didn't mention

5    that.  I have to pay that stuff back to my sister.  She even

6    lent me enough money for a truck, so I could have something to

7    get around in, try to find another apartment.

8          While I tried to cash her check, my son and I got run

9    over by a car.  Ran through a red light.  It's the same time

10   they canceled my Social Security check, for no apparent reason.

11   But I had filled out reports and reestablished that.  Then a

12   month later my wife dies in a nursing home.  They didn't think

13   I was taking care of her good enough at home, so they thought

14   she would be better taken care of in a nursing home, where her

15   health constantly got worse.  Her diabetic ulcer got worse, her

16   diabetes get worse.  She got rashes.  Then she started having

17   mysterious falls.  They just kept telling me it's a

18   Medicaid-funded nursing home, there's only so many nurses for

19   so many patients.  We can't watch everybody all the time.  We

20   can't put up bed railings for everybody here.

21         Then she dies, January 20th, she dies, and I am in the

22   truck with my son.  We are sleeping right outside the nursing

23   home when that happened.  She had the third mysterious fall.

24   The hospital was alerted.  This never should have happened.

25   Police were investigating.  We understand the police in the

1    corner, said it was suspicious, but no investigation was done.

2    Said, "It's a nursing home.  She is an old lady that fell."

3    She was 54 years old.  Then in three days the Social Security

4    Office does this again, sends me another letter saying they are

5    going to cancel.  The only income I have.  I have got my

6    disabled son, with a broken arm, living in my truck, getting

7    canceled for apartment after apartment, just because I don't

8    make enough money anymore on Social Security, and I can't do

9    anything to increase that.

10          And I am going through the VA.  Go through two VA

11   homeless programs.  Neither one can get me an apartment.  There

12   are no apartments in Colorado Springs.  But they are getting

13   government grant money to get me an apartment, because I'm a

14   veteran.  No.  They take me to places, I fill out applications

15   for them, so I can go to another organization and fill out

16   their applications to get grant money.  So I can get an

17   apartment, and I am still turned down.

18          And yeah, I'm -- I'm an ass.  I can talk like an ass.

19   I'm more like a badger backed up against a wall.  I went to the

20   Social Security Office to demand the money that I worked my

21   whole life for.  I worked all of my life, paid my taxes, and

22   this Social Security was for this contingency, if something

23   happened to me, I'm disabled, I have something to fall back on,

24   and it ain't enough, because there's too many people out here,

25   and they just don't have enough money.

1            I went there to raise hell.  I didn't want to stand in

2    line for another two to four hours, because at Social Security

3    that's how long you got to wait, because there's so many people

4    with problems, because our Social Security is screwed up.

5            Then I get told to leave, and I start leaving and

6    somebody has to say something, so I come back and I say

7    something back and it's words.  Then I get challenged by the

8    Social Security guard, daring me to -- challenging me to fight

9    him.  "Come on, puts your hands up, put your hands up, I dare

10   you," and I don't.  I walked away.  When I walk away again he

11   came behind me then he put his hands on me, that's when I lost

12   it, and I pepper sprayed him with a can of pepper spray I got

13   from Walmart®, because my son and I were camping and sleeping

14   out in places where there's bears.  We have to walk to the

15   outhouse every night.  We both had little key chain pepper

16   sprays that we carried just in case we run into an animal.

17           And then after I get subdued by two security guards

18   and I am handcuffed, face down on the sidewalk, got taken an

19   opportunity to bash my face off the sidewalk too.  These are

20   the highly skilled professional people that I'm being tried

21   against.  They make them out like they are federal agents of

22   the United States Government.  I'm more of an agent.  I'm a

23   veteran, and I work -- I told them, I worked my whole life,

24   paid my taxes.  All I wanted was what was mine.  They had me at

25   the worst possible time.  All of the things built up.  The VA

1    woman to the VA that I have been trying to get help from.

2            Then, while I'm in the halfway house, they don't give

3    me the medicine that I have been taking.  They want to give me

4    other medicine.  Other medicine that made me sick.  Then they

5    tell me, he is refusing to take his medicine.  It's not that

6    I'm refusing to take my medicine.  I'm refusing to take their

7    medicine.  Experimental stuff that they don't know what it

8    does, but it works on some people, so we'll give you this

9    instead of that.  We don't want to give you painkillers for

10   your pain, because I have got pancreatis and a heart condition

11   and I have a crippled back, I have nerve-block injections.  I'm

12   on some of that, and then they won't give it to you when you

13   need it.  They have certain times they want to give you

14   medicine and that's it, and it's not like I was refusing help,

15   psychological help.  I was refusing their psychological help

16   because it was useless.  Didn't do any good.  I went to their

17   counselor.  Their psychiatrist.  I went for many weeks.  I

18   couldn't go to mine.  I couldn't go to my VA people.

19           So it's not like I refused.  No.  That's -- that's

20   about it.  All this stuff, like he said, 55 years without any

21   problem.  All this stuff, built up in the same timeframe, from

22   the pitbull attack, to the other suicide attempt, where I got

23   beat up in the hospital, and I get charged with three counts of

24   assault for getting beat up, because people got hurt beating me

25   up, and then, this, with this.  Otherwise, I never been in jail

1    till I come to Colorado.  All of this stuff.  That's all I got

2    to say, Your Honor.  Thanks.

3          THE COURT:  All right.  In fashioning a sentence here

4    today I have considered the presentence report, all matters

5    related to that report, that have been filed by the defendant,

6    as well as the government, as well as the statements and the

7    arguments for counsel for the parties, as well as the statement

8    of defendant.  I am mindful of the fact that I am required by

9    law to impose a sentence which is sufficient, but not greater

10   than necessary, to achieve the purposes of sentencing as

11   described in 18 U.S.C. 3553.

12         In fashioning that sentence, I have considered both

13   individually and as a whole all of the 3553(a) factors, which

14   must be considered, and I note that those factors, at least in

15   this case, are all pulling in slightly different directions.

16         I have discussed and considered factors, all of them,

17   regardless of whether they have been specifically labeled in

18   the course of our discussion here today.

19         Mr. Gerber, I want you to understand the sentence that

20   I'm going to impose.  I'm going to tell you what I'm going to

21   do before I actually do it.  When I actually impose the

22   sentence, it tends to be more ritualistic, the language that

23   ends up being used.  And I am going to tell you why.

24         I will tell you that this is a case that is -- well,

25   I'm less comfortable with this case than I am with others,

1    because there are issues here that are real.  There are

2    mental-health issues, there are violence issues, there are the

3    facts, as your lawyer has explained them to me.  I do not take

4    lightly the notion that an individual goes 55 years with

5    nothing, and then all of a sudden something happens, and it's

6    because some character trait that's been hidden for 55 years.

7    I'm not sure, and I don't want to make it sound as if you're a

8    saint, and that any of the aggression or distrust or resistance

9    that you display is all a product of mental illness.  I can't

10   say that.  I don't know that anyone can carve this -- I put the

11   task in front of the lawyers, recognizing full well that I

12   would have an intelligent discussion, but that no one has a

13   magic device that enables me to apportion the percentages.

14           So here is where I come down.  I'm going to give you a

15   year and a day, and the reason that I'm doing that is this,

16   this is a crime of violence.  There remains in you, not -- and

17   I am not referring to -- I could, but I'm not referring to your

18   statement here today, but there remains this residual, whether

19   it be anger or rationalization, that, you know, you are not

20   being dealt the hand that you are entitled to.  It presents in

21   terms of what happened at the Social Security, and I have also

22   paid attention to what happened after that, when one would, at

23   least, be expected to be on best behavior, so to speak, and it

24   hasn't played out that way.

25           There have been incidents at the halfway house.  There

1    were incidents at Denver -- excuse me -- Douglas County --

2         *THE DEFENDANT:* I can explain those.

3         *THE COURT:* -- Jail. I know you can. And I

4    understand, from the presentence report, what the explanations

5    are. There have been messages that I don't know whether it's

6    consciously sent to me or not -- we don't need you up here. Go

7    away. That last comment is for my next case. Counsel is

8    trying to get to the podium, and I want to keep this focus

9    where it is.

10        I don't know that it's conscious, but make no mistake,

11   the, "If I don't get let out, I'm going to commit suicide,"

12   that's a message meant for me. I interpret it that way.

13   There's a lot about this case that's very, very complicated,

14   and I think that ignoring the residual issues that remain and

15   are persistent, would be to ignore the risk that comes with

16   that.

17        Yes, you have had one hell of a bad hand dealt to you,

18   and I get that. And I am varying downward from the guideline

19   range to a year and a day, because I think, quite frankly, the

20   only thing that can say to you is, I have tried to balance all

21   of these things. The public's safety, the need to deter

22   others, the need to deter you, send a message to you, the need

23   to recognize your individual circumstances that obviously

24   contributed greatly to where you are today. All of those

25   things. And where we are is this, I'm giving you a year and a

1    day, if you get your conduct in order, you can earn 54 days of

2    good time, and essentially a year and a day turns into a little

3    more than ten months.

4          The Bureau Of Prisons has it within their ability to

5    release you to a halfway house early.  That, again, is based on

6    how you perform.  So, to some extent, what I'm saying to you,

7    and to be clear, I'm not sentencing you because I want to give

8    you a challenge, but I am explaining to you that you have a

9    great deal more power in this instance than you might otherwise

10   appreciate, to shorten that sentence beyond the raw time that

11   I'm giving you.  And if you are reluctant or refusing to

12   cooperate, then fine, do the time, you will be out on

13   supervised release, and we will be having another discussion

14   with each other down the road.  Hopefully that won't happen.

15         But I think the appropriate balance, in this case, is

16   not to give a guideline sentence, nor is it to give

17   time-served.  It's to give some carrot and some stick, and that

18   it's a year and a day, with the three years of supervision,

19   with the special conditions that I have explained, with the

20   restitution that probation has recommended, and nobody has

21   challenged, and a hundred dollar Special Assessment Fee as

22   required by law.  Mr. Burrows?

23         *MR. BURROWS:*  Your Honor, did you intend to impose a

24   community confinement condition on the supervised release?

25              *THE COURT:*  That is part of the conditions.  Yes.

1          MR. BURROWS:  Okay.

2          THE COURT:  Anything else?

3          MR. BURROWS:  No, Your Honor.

4          THE COURT:  Mr. Sullivan?

5          MR. SULLIVAN:  No, sir, thank you.

6          THE COURT:  Then gentleman, I know there's great many

7    people here for the 11 o'clock.  We are close, that's all I can

8    tell you.

9          I have determined what the guidelines are.  I find

10   that there's a reason to vary from the advisory sentencing

11   guideline range from the minimum 15 months to a year and a day,

12   for the reasons that I have explained.  It is the history and

13   characteristics of the defendant and the nature and

14   circumstances of the offense that drive my decision, all as

15   discussed over the course of this hearing, and so, therefore, I

16   do vary from the guidelines to a year and a day.

17         Pursuant to the Sentencing Reform Act of 1984, it is

18   the judgment of the Court that the defendant,

19   Michael Arthur Gerber, is hereby committed to the custody of

20   the B.O.P. to be imprisoned for a term of 12 months and one

21   day.

22         Upon release from imprisonment, he shall be placed on

23   supervised release for a term of three years.  Within 72 hours

24   of release from the custody of the Bureau Of Prisons, you shall

25   report, in person, to the probation office in the district to

1       which is he released.

2              While on supervision, you must not commit another,

3       federal, state or local crime.  You must not unlawfully possess

4       a controlled substance.  You must refrain from any unlawful use

5       of a controlled substance.  You must submit to one drug test

6       within 15 days of placement on supervision and two periodic

7       tests thereafter.  You must cooperate in the collection of DNA

8       as directed by the probation officer.  You must comply with the

9       standard conditions adopted by this Court in General Order

10      2016-1, with the exception of that standard condition which

11      mandates employment, which I believe to be General Order

12      standard condition number seven.

13             *PROBATION:*  That's correct, Your Honor.  I verified

14      that.

15             *THE COURT:*  I find, in addition, that there are

16      special conditions that are reasonably related to the factors

17      enumerated in 3553(a) and 3583, which, based on the nature and

18      circumstances of the offense, history and characteristics of

19      the defendant do not involve a greater depravation of liberty,

20      than reasonably necessary to accomplish the goals of

21      sentencing.  Therefore, I impose the following conditions; one,

22      you must participate in and successfully complete a program of

23      mental-health treatment as approved by the probation officer,

24      until such time as you are released from the program by the

25      probation officer.  You must pay for the costs of treatment as

1   directed by the probation officer.

2   　　　Two, you must remain medication compliant and must

3   take all medications that are prescribed by your treating

4   psychiatrist.  You must cooperate with random blood tests as

5   requested by your treating psychiatrist and/or supervising

6   probation officer to ensure that a therapeutic level of

7   prescribed medications is maintained.

8   　　　Three, you must reside in a residential reentry center

9   upon release -- upon completion of the service of your period

10  of incarceration for a period of up to six months, to commence

11  upon release from imprisonment, and you must observe the rules

12  of that facility.  You may be discharged earlier than six

13  months by the probation office, if you are in compliance with

14  supervision and when a suitable release plan has been approved

15  by the probation officer.

16  　　　Four, the judgment will impose financial conditions,

17  and therefore, you must pay the financial penalties and

18  restitution in accordance with the schedule of payments that is

19  part of this judgment.  You must also notify the Court of any

20  changes in economic circumstances that might affect your

21  ability to pay the financial penalties or restitution.

22  　　　With regard to those matters, five, six and seven, I

23  do not intend to impose those.

24  　　　You must make restitution to the victims and in the

25  amounts indicated in the presentence report.  You shall make

1    restitution in accordance with 18 U.S.C. 3663 and 3663A.  The

2    amount of restitution is 66 dollars and some odd cents.

3          *PROBATION:*  Nineteen cents, Your Honor.

4          *THE COURT:*  Nineteen cents.  And that is as set forth

5    in the presentence report, the individuals to whom those

6    amounts are to be paid.

7          In terms of application of any payment, it shall be

8    proportional to the two victims that are involved.

9          The defendant does not have the ability to pay

10   interests.  It is ordered that the interest requirement is

11   waived for the restitution.  You must pay a special assessment

12   of $100, which is due and payable immediately.  He does not

13   have the ability to pay a fine, so Mr. Gerber is not required

14   to pay a fine.  I'm waiving imposition of a fine in this case.

15         All monetary obligations shall be due as follows,

16   special assessment and restitution are due immediately.  Any

17   unpaid monetary obligations, upon release from incarceration,

18   shall be paid in monthly installment payments.  During the term

19   of supervised release, the monthly installment payment will be

20   calculated as at least 10 percent of the defendant's monthly

21   gross income.

22         The defendant is -- well, and I make the following

23   special -- I make the following recommendation to the Bureau Of

24   Prisons.  I recommend to the Bureau Of Prisons that they --

25   that they ... assure that Mr. Gerber takes as and when required

1    any and all medication prescribed by his psychiatrist.

2           Mr. Gerber, I do that for two reason, one, I think it

3    is necessary and appropriate; two, my understanding of what the

4    B.O.P. does with recommendations from the District Court are

5    that sometimes they are factored into their assessment of

6    whether or not one has earned his good-time credit.  I am not

7    saying to you that I am asking them to do that.  I'm not.  But

8    I'm not opposed to it either.  And I emphasizing, again, to

9    some extent, you have more control over what happens to you

10   than a great many other people might have.

11          The defendant is advised of his right to appeal the

12   sentence.  If he desires to appeal, a Notice Of Appeal must be

13   filed with the Clerk Of The Court within 14 days after entry of

14   judgment or the right to appeal will be lost.  If the defendant

15   is unable to afford an attorney for an appeal, the Court will

16   appoint one to represent him.  If the defendant so requests,

17   the Clerk Of The Court must immediately prepare and file a

18   Notice Of Appeal on his behalf.

19          Anything further from the government?

20          *MR. BURROWS:*  No, Your Honor.

21          *THE COURT:*  Any comment with regard to the

22   recommendation to the Bureau Of Prisons?

23          *MR. BURROWS:*  No, Your Honor.

24          *THE COURT:*  Same questions to you, Mr. Sullivan?

25          *MR. SULLIVAN:*  No, sir.  Thank you.

1    THE COURT:  All right.  It is ordered that the

2    defendant is remanded to the custody of the U.S. Marshals.  I

3    make a special request of the U.S. Marshals.  I instruct you to

4    advise the B.O.P., upon returning Mr. Gerber to their facility,

5    I believe looks like the F.D.C., that he has advised others

6    that it is possible that he may commit suicide if I do not

7    release him today, and I have not.  I'm not asking you to do

8    anything or give them any instruction.  I'm simply asking you

9    to call that fact to their attention when you return him to the

10   facility for service of the sentence.

11        THE U.S. MARSHAL:  Will do, Your Honor.

12        THE COURT:  We will be in recess.

13        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

14   (Recess at 11:06 a.m.)

15              REPORTER'S CERTIFICATE

16

17       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

18

19       Dated at Denver, Colorado, this 14th day of March, 2019.

20                    s/Tammy Hoffschildt

21                    _____

22                    Tammy Hoffschildt, FCRR,RMR,CRR

23

24

25